UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHAKEETA MYLES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:21-CV-03935 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| COOK COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Chakeeta Myles brings this employment discrimination suit against her former employer, Cook County. R. 10, Am. Compl.[1] The County moves for summary judgment on Myles' claims of race discrimination, retaliation, and hostile work environment. R. 91, Def.'s Mot. Because no reasonable jury could find for Myles on any of the claims, the County's motion is granted in full.

## I. Background

In deciding the County's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, Chakeeta Myles. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Myles identifies as Native American but explains that "[f]or all practical intents and purposes, Plaintiff is Black," and is commonly assumed to be Black. R. 105, Pl.'s Resp. at 2 (citing R. 107, PSOF ¶ 2); R. 107-1, Pl.'s Exh. 1, Myles Decl. ¶ 2. Myles was a Field Auditor

---

[1]The Court has subject matter jurisdiction over the Title VII claims under 28 U.S.C. § 1331. Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

in the Cook County Department of Revenue from May 2013 to May 2020. R. 93, DSOF ¶¶ 1, 61; R. 93-1, Def.'s Exh. 1, Myles Dep. at 23:7–14; R. 96, Def.'s Exh. 34, Termination Letter. During her tenure at the Revenue Department—and because of her good work for the Department—she received two promotions: one in 2014, and another in 2016. DSOF ¶¶ 1–2, 11; Myles Dep. at 93:24–94:5, R. 94, Def.'s Exh. 6. Zahra Ali held the position of the Director of the Revenue Department during Myles' employment with the County. DSOF ¶ 2; R. 94, Def.'s Exh. 5.

### A. Issues with Coworkers

Myles began experiencing "friction" with two of her co-workers, Deimante Davaliyte (who goes by Deima) and Lynn Stailey, sometime after her 2014 promotion. DSOF ¶ 3; Myles Dep. at 296:16–297:2. The first instance of hostility happened in 2014 when Deima called Myles into her office and asked that they go through Myles' resume to "figure out how [Myles] got a position" over her. PSOF ¶ 7; Myles Dep. at 300:21–301:11. The next time happened in February 2016, when Myles overhead Deima tell Lynn that another coworker was in a "usual black girl tude," and called Myles a "black bitch." DSOF ¶ 4; PSOF ¶ 5; Myles Dep. at 267:6–16, 308:10–14. Days later, Deima approached Myles and said that the overheard comments were not references to Myles. DSOF ¶ 4; R. 94, Def.'s Exh. 9, Myles Email to Self at 390 (PDF page number). Myles reported the incident to the County during the next month, in March 2016, via a typed letter to Revenue Department Director Zahra Ali. DSOF ¶ 4; Myles Email to Self at 388 (PDF page number). In May 2018, Myles wrote an email to herself reiterating her complaints of bullying by her coworkers and stating that

2

"[Deima and Lynn] won't give up they torment me and they say all type of racist things like let's sprinkle some black girl magic and these black people think they have it made." DSOF ¶ 14; R. 94, Def.'s Exh. 13.

The next incidents of hostility that Myles reported to management related to a different coworker—Robert Giacomelli (who is referred to by Bob by the parties and in various exhibits)—who made offensive comments about politics and race. DSOF ¶ 5; Myles Dep. at 264:4–266:23. The report, submitted to Director Ali, described "the things that Bob has done consistently at the workplace to make it uncomfortable," including "making racist comments." Myles Email to Self, at 388 (PDF page number). For example, Bob remarked on the tragic shooting in Charleston, South Carolina, calling Black churchgoers the "bad guys," and Bob also made allegedly improper re-marks about President Trump and voting. DSOF ¶ 5; Myles Dep. at 265:20–266:5; Myles Email to Self, at 389 (PDF page number). Myles also remembers overhearing Bob use the racial epithet N-word in the office around five to ten times between 2013 and 2020. PSOF ¶ 15; Myles Dep. at 288:20–289:5. Myles reported him for using the epithet "at least three to five times a year" throughout her employment. PSOF ¶ 16; Myles Dep. at 273:6–15.

Rewinding back in time, in response to Myles' March 2016 letter complaining of racially insensitive behavior from her coworkers, the Revenue Department reached out to the Cook County Board of Ethics, which resulted in the Illinois Department of Human Rights delivering a sensitivity training to the full staff in August 2016. DSOF ¶¶ 6–7; R. 94, Def.'s Exh. 2, Ali Dep. at 36:18–37:9, 113:3–8. But in the years after

3

the training, Bob continued to act out and even had a "heated exchange" with their coworker, Richard Kenyi, in which Bob called Kenyi an "ignorant [N-word]" after Kenyi had walked away. PSOF ¶ 17; Myles Dep. at 259:5–22. Myles reported this orally to her managers, Gary and Jose, but is not sure whether any remedial steps were taken. PSOF ¶ 17; Myles Dep. at 260:8–13.

To resolve the issues between Myles and her coworkers, management separated Deima and Lynn from Myles' work area by moving them into the back room. DSOF ¶ 15; Myles Dep. at 83:13–84:6. Bob was also moved at this time. Myles Dep. at 84:8–15. Myles believed this would be the end of her troubles, but her coworkers continued to come near her desk to use the copy machine and restroom, and continued to "talk[] trash" while doing so. PSOF ¶ 8; Myles Dep. at 310:6–311:9. Specifically, Deima and Lynn would make comments such as "let's sprinkle some Black magic on Chakeeta," within Myles' earshot, and would place Myles' printing material on top of the shredder to be shredded. PSOF ¶ 8; Myles Dep. at 310:8–24. Myles estimated that they did those things around a few times a month. PSOF ¶ 8; Myles Dep. at 311:8–18. Myles maintains that she reported each instance of racial hostility to management either orally or in writing and felt as though "nothing was ever done in response to her complaints." PSOF ¶ 20; Myles Dep. at 287:22–288:13, 337:19–338:10.

### B. The Elevator Incident

In January 2020, Myles got into a physical altercation—she calls it a "scuffle"—with another County employee in the lobby and elevator of the County building in Chicago. DSOF ¶ 18; Myles Dep. at 130:8–133:13. The other employee, Michelle Lord,

4

worked in the Assessor's Office and was not a coworker of Myles' in the Revenue Department. DSOF ¶ 18; Myles Dep. at 198:14–23. There is a lobby-camera video recording of the start of the incident: both Myles and Lord were walking through the lobby, separately, towards the elevators. PSOF ¶ 38; R. 98, Elevator Video at 0:28:37–0:28:53. Myles and Lord bumped into each other while approaching the elevator doors. DSOF ¶ 19; Elevator Video at 0:28:46–0:28:50. The two then exchanged words. DSOF ¶ 20; PSOF ¶ 38; Elevator Video at 0:28:50–0:28:52. In a post-incident interview, Myles accused Lord of calling Myles a "dumb ass black bitch." PSOF ¶ 43; R. 96, Def.'s Exh. 35, OIIG Report at 313 (PDF page number). They had a physical altercation as they went into the elevator, and inside it too. DSOF ¶ 21–22; PSOF ¶ 38; Elevator Video at 0:28:51–0:28:53. Witness C (the parties use letter designations drawn from an inspector general report) saw the incident from behind the two, and remembers Myles being "aggressively" shoved by Lord onto the elevator. PSOF ¶ 41; OIIG Report at 5. Witness A was already inside the elevator and reported that Myles and Lord were "jostling with one another to get in the elevator," and arguing about who ran into whom. PSOF ¶ 39; OIIG Report at 308 (PDF page number). While in the elevator and after the doors closed, Witness A said that Myles grabbed Lord by the back of the neck and pinned her against the elevator buttons. PSOF ¶ 39; OIIG Report at 308 (PDF page number). Witness B heard Myles ask Lord why she (Lord) pushed Myles, and Witness B also reported that Myles put her hands near the back of Lord's head inside the elevator before the doors closed. PSOF ¶ 40; OIIG Report at

309 (PDF page number). Eventually, Myles and Lord "stopped tussling" a few floors up. *Id.*

Myles reported the incident to the Bureau of Human Resources Equal Opportunity Office (EEO) and to local law enforcement. DSOF ¶¶ 27–28; Myles Dep. at 197:6–10; 198:5–13; OIIG Report at 308 (PDF page number). Several days later, Myles also wrote an email to Cook County officials; the email said that Myles had been "experiencing workplace harassment" since 2016, noted that Revenue Department management had "done the best they could do to shield [her] from this terrible stress," but that she was now being targeted by Lord after Lord shoved her and called her racial slurs. DSOF ¶ 35; R. 96, Def.'s Exh. 23, Feb. 2020 Email.

The matter was referred to the Cook County Office of the Independent Inspector General (the parties refer to the office as the OIIG) to conduct an independent investigation. PSOF ¶ 26; R. 94, Def.'s Exh. 4, Barrientos Dep. at 14:2–21. John Barrientos was the investigator assigned to the incident. PSOF ¶ 26; Barrientos Dep. at 12:18–23. As part of his investigation, Barrientos interviewed witnesses, reviewed police reports and video evidence, and requested disciplinary records for both Lord and Myles. PSOF ¶¶ 26–27; Barrientos Dep. at 19:11–17. He also interviewed Myles and Lord. OIIG Report at 311–315 (PDF page numbers). During his interview with Myles, Barrientos asked her why she sent her February 2020 email to elected officials; Myles responded that she was "unaware that she should not contact elected officials to intervene in employment matters." PSOF ¶ 46; OIIG Report at 315 (PDF page number). Barrientos testified that he asked this "to determine whether or not

[the email] was a violation of the employment plan," but concluded that there was not enough evidence to pursue that as a violation. Barrientos Dep. at 79:3–15; 82:14–20. Barrientos concluded that the video of the elevator incident showed Myles as the aggressor. PSOF ¶ 38; Barrientos Dep. at 51:18–24. After conducting his investigation, Barrientos submitted a report to Myles' supervisor (Department Director Ali), finding that Myles violated Cook County Personnel Rule 8.2(b)(3) by "engaging in fighting and disruptive behavior," and recommended termination. PSOF ¶ 49; OIIG Report at 315–16 (PDF page numbers). Barrientos could have recommended Lord's termination to Lord's supervisor, but did not feel it was warranted. PSOF ¶ 50; Barrientos Dep. at 112:18–21.

Relying on the OIIG report findings, Ali decided to terminate Myles' employment. PSOF ¶ 52; Ali Dep. at 76:21–77:8. Ali did not make any decisions about Lord because Lord was employed by a separate County office and answered to a different supervisor. DSOF ¶ 52; Ali Dep. at 72:9–13. Myles had her pre-disciplinary hearing in April 2020 and was represented by a union steward. DSOF ¶ 54; R. 96, Def.'s Exh. 33, Email re: Hearing Notes. The presiding Commissioner sustained the findings of the hearing and agreed with the recommendation; Myles was fired in May 2020. DSOF ¶ 58; Termination Letter.

In August 2020, Myles filed an EEOC charge alleging that during her time at the Revenue Department, she experienced a racially hostile work environment and race discrimination. DSOF ¶ 72; R. 10, Am. Compl., Exh. A, EEOC Charge. She then

filed this suit against the County under Title VII alleging race discrimination, retaliation, and a hostile work environment. Am. Compl. at 4–6.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party

must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Race Discrimination

Myles claims that the County violated Title VII by discriminating against her on the basis of her race. *See* 42 U.S.C. § 2000e-2(a)(1). On the termination claim, Myles ultimately must show that her race caused her termination. *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018). At the summary judgment stage, the evidence must be viewed in Myles' favor, and all relevant evidence must be considered "as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). As a practical matter, there are two methods of evaluating a plaintiff's claim of discrimination.

First, under the *McDonnell Douglas* framework, Myles can get past summary judgment if she successfully relies on the prima facie and burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). If she can show a prima facie case of discrimination, then the burden shifts to the County to offer a legitimate, nondiscriminatory reason for its decisions. *See id.* If the County can do so, then Myles must show that the given reason is pretextual, that is, a cover-up for race discrimination. *McDonnell Douglas*, 411 U.S. at 804.

The second route past summary judgment is to examine the evidence as a whole. The Seventh Circuit has cautioned against adhering too strictly to any one test or analysis, lest it screen out valid claims of discrimination based on

9

circumstantial evidence that does not fit neatly within a certain framework—but still would suffice for a reasonable jury to find discrimination. *Ortiz*, 834 F.3d at 765. If Myles cannot prevail using the *McDonnell Douglas* method, then she can still defeat summary judgment if she marshals enough circumstantial evidence for a reasonable jury to conclude that the County discriminated against her. *Id.*; *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

### 1. Prima Facie Case

The parties primarily focus on the *McDonnell Douglas* framework to assess whether Myles has enough evidence of race discrimination. To rely on this framework to survive summary judgment, Myles must provide evidence showing that (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of her protected class received better treatment from her employer. *See Smith*, 806 F.3d at 905. Even when viewing the evidence in the light most favorable to her, Myles fails on the second and fourth requirements.

To begin, the parties do not dispute the first or third elements of the *McDonnell Douglas* framework. Myles is a Native-American woman and has been considered Black "for all practical intents and purposes," so she is a member of a protected class. Myles Decl. ¶ 2.[2] And Myles was fired, which of course qualifies as an adverse

---

[2]Although the County does not argue in its briefing that Myles is not a member of a protected class, the County asserts in its Rule 56.1 Statement that Myles is not Black. DSOF ¶ 1. The County points to Myles' testimony in which she denied being Black or African American and explained that she is Native American. *Id.*; Myles Dep. at 298:13–299:4. But the

employment action. DSOF ¶ 60; Termination Letter; *see also Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (listing termination as an example of "a materially adverse change in the terms and conditions of employment") (cleaned up).[3]

Applying the prima facie framework to the termination in this case, it makes sense to discuss the second and fourth elements together because Myles' assertions that she performed to the County's legitimate expectations is intertwined with her assertion that Lord is a similarly situated employee. The County argues that Myles cannot meet the second and fourth elements because she did not meet the County's legitimate expectations because she fought Lord in the elevator, and the comparator whom she identifies—Lord—is not similarly situated. Def.'s Br. at 5–7. Generally speaking, an employer's legitimate expectations are simply "bona fide expectations, for it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). Put another way, an employer can reasonably expect employees to adhere to its policies, so long as the policies are not themselves discriminatory and are enforced evenhandedly. *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010). For this element, "the inquiry must focus on [the employee's]

---

County also states in its briefing that Myles' EEOC charge alleged that "her termination was based on her race (black)." Def.'s Br. at 3. For the purposes of this Opinion, and because the County does not connect this point to its substantive arguments, the Court need not resolve the dispute.

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

performance at the time of [her] dismissal." *Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 676 (7th. Cir. 2006); *see also Igasaki v. Ill. Dep't of Fin. and Prof. Reg.*, 988 F.3d 948, 959 (7th Cir. 2021) (explaining that "past performance is largely irrelevant" in the discrimination inquiry).

Myles' main obstacle in this case is the fact that an independent investigating agency—the Office of the Independent Inspector General through investigator Barrientos—investigated the elevator incident, interviewed witnesses, viewed the video, and came to a reasoned conclusion that Myles was the aggressor and thus violated the personnel rules against violence in the workplace. PSOF ¶¶ 26, 38; Barrientos Dep. at 19:11–17, 51:18–24. Myles admits, at the very least, that the altercation with Lord amounted to a "scuffle." R. 106, Pl.'s Resp. to DSOF ¶ 18; Myles Dep. at 129:18–130:3. She also admits that the decision to terminate her was specifically based on the physical altercation with Lord, which was found to be a rules violation. Pl.'s Resp. to DSOF ¶ 59; Termination Letter. For the purposes of the legitimate-expectations inquiry, one day's worth of misconduct may suffice to conclude that the employee "failed to meet [an employer's] legitimate expectations as established by its Code of Conduct and Workplace Violence policy." *See Anders*, 463 F.3d at 676.

Barrientos' conclusion also had a reasonable basis: the video showed a physical altercation between the two women, and—even if Lord insulted Myles and contributed to the start of the fight—at least two witnesses reported that Myles was physically violent with Lord while in the elevator. Elevator Video at 0:28:51–0:28:53; OIIG Report at 308–09 (PDF page numbers)So Barrientos' conclusion that Myles was the

instigator was not so unreasonable that it can serve as evidence of the OIIG's (or the County's) discriminatory motive. It would be one thing if the purported basis for the firing was so unreasonable that a reasonable jury could infer from the fake basis that the County is covering up race discrimination. In this case, however, a reasonable jury cannot make that inference given the circumstances. Myles falls short on showing that she was meeting the County's legitimate expectations when the County reasonably relied on the witnesses' description of the violence that she committed.

Nor can Myles show that Lord is a suitable comparator for purposes of the prima facie case. A similarly situated comparator is one that has "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). Here, it is true that both Myles and Lord were subject, generally speaking, to Cook County Personnel Rule 8.2(b)(3) on Fighting and Disruptive Behavior. PSOF ¶ 50; R. 96, Def.'s Exh. 26, Cook County Personnel Rules at 1.02. But the similarities end there. The OIIG's conclusion that Myles—not Lord—was the instigator precludes an argument that the two women engaged in similar conduct. As discussed above, that conclusion was not so unreasonable as to suggest that it was the product of Barrientos' biased favoring of Lord. And Lord was an employee of an altogether different office of the County; Lord did not report to Director Ali; and,

indeed, Lord could not have been fired by Ali.[4] Myles Dep. at 319:13–320:3 (admitting that Lord was not a coworker); Ali Dep. at 72:9–16. Myles has thus failed to provide a comparator to meet the prima facie framework.

It is worth noting that even if Myles could establish a prima facie case, thus shifting the burden to the County, the County successfully provided a legitimate, non-discriminatory reason for removing Myles—and no reasonable jury could find otherwise. The County's dismissal was explicitly based on its finding that she violated Cook County Personnel Rule 8.2(b)(3) and the Violence-Free Workplace Policy when she was "physically violent" with Lord. *See* Termination Letter. Myles does not dispute that termination from employment is a permissible disciplinary measure for a violation of those policies or that the OIIG's recommended termination was based on its finding that she violated the policy. Pl.'s Resp. to DSOF ¶ 50. As discussed earlier, this finding was a reasonable conclusion based on the information available to Barrientos during his investigation. The County has met its burden to provide a legitimate, non-discriminatory reason.

---

[4]Myles argues that Barrientos, not Director Ali, was the supervisor for the purposes of the comparator inquiry and that Barrientos' authority to recommend discipline for Lord proves that the two women shared a supervisor. Pl.'s Resp. at 20. She relies on *Coleman v. Donahoe*, a case in which a single person approved the discipline for both comparators. 667 F.3d 835, 848 (7th Cir. 2012). There, the court explained that the decisionmaker is "the person responsible for the contested decision." *Id.* (cleaned up). In that case, it was the singular person who conducted the investigation, found that both the plaintiff and comparator violated the same rule, signed the letters terminating the plaintiff, and testified that he also made the choice to discipline the comparators. *Id.* In contrast, here Barrientos investigated the incident but Ali had discretion on whether to follow his recommended discipline. Ali Dep. at 65:16–20. And because Ali did not have the same discretion for Lord—who worked for a separate County office—this case is not analogous to *Coleman*. Ali Dep. at 72:9–16.

Myles' argument that the County's proffered reason is pretextual falls short, even with the benefit of reasonable inferences in her favor. Pretextual reasons are *false* reasons, not merely ones that are unfair to the employee. *Anderson v. Mott St.*, 104 F.4th 646, 653 (7th Cir. 2024). "[I]dentifying an inconsistency (or even a lie) is not necessarily sufficient to prove that the employer's rationale was pretext for discrimination." *Groves v. South Bend Cmty. Sch. Corp.*, 51 F.4th 766, 770 (7th Cir. 2022). Instead, Myles must provide evidence that would allow a reasonable jury to find that race was the basis for the adverse action. *See id.* (citing *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020)).

Myles fails to do so. She primarily focuses on the contents of the OIIG Report to argue that Barrientos *had* to have been biased to conclude that she was the aggressor in the video, while also pointing to specific word choices in the report as evidence of pretext. Pl.'s Resp. at 22–26. But the propriety of Barrientos' apportionment of blame from the video is not up for right-or-wrong *de novo* review—the question is whether his finding is so unreasonable that a jury could find that it was pretextual. "Whether or not [the County] may have been … unwise in its discipline and subsequent termination … is not for this Court to determine …. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Gates*, 513 F.3d at 691 (cleaned up). Myles essentially argues that Barrientos cherry-picked information from his investigation to build a case against her, but her disagreement with his weighing of the information and the witnesses does not establish that he was actually lying to hide his true discriminatory intent. Barrientos did not

15

know either Lord or Myles, and Myles has not presented any concrete evidence that he had a particular reason to skew the outcome of his investigation in Lord's favor. At most, Myles argues that Barrientos' failure to include Lord's disciplinary record in his investigation is evidence that he did not treat the women the same. Pl.'s Resp. at 25; PSOF ¶¶ 33–37 (discussing Lord's prior disciplinary issues). But it is far too speculative to infer from that omission that Barrientos and the OIIG discriminated against Myles. And the discriminatory inference is substantially undermined by the elevator witnesses' descriptions of how Myles grabbed Lord by the back of the neck, or near the back of her head, and how Myles pinned Lord against the elevator buttons. PSOF ¶ 39–40; OIIG Report at 4–5. Nor is it odd that discharge is a form of available discipline against employees who violate the County policies against violence. Myles' race discrimination claim on the termination cannot survive summary judgment by relying on the prima facie framework.

### 2. Overall Evidence

Taking a step back, as explained earlier, there is a second way for a discrimination claim to survive summary judgment. Even absent a *McDonnell Douglas* prima facie case, Myles would still defeat summary judgment if she offers enough circumstantial evidence that would allow a reasonable jury to find that she was the victim of discrimination. *Ortiz*, 834 F.3d at 765. The ultimate question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Id.* But Myles'

claim does not survive summary judgment even on this overall examination of the evidence.

Just as Myles could not overcome the fact that the OIIG's investigation led to the finding that she had violated workplace policy for the prima facie framework, so too she cannot overcome it in evaluating the overall evidence. Myles does not dispute that her firing was specifically premised on "[Myles'] physical violence of grabbing Lord and holding her against the wall of an elevator." Pl.'s Resp. to DSOF ¶ 59; Termination Letter. She primarily argues that she did not violate the policy and that Lord did. Pl.'s Resp. at 26. But because she admits that the altercation did in fact occur, and that she went into "defensive mode" and engaged in the "scuffle," her argument that these actions should not amount to a violation simply because Lord allegedly started it fall flat. Myles Dep. at 131:16–133:2. Rule 8.2(b)(3) prohibits "fighting" specifically, and there is no doubt that Myles and Lord fought. As explained earlier, a reasonable jury would have no choice but to find that Myles' violation of workplace rules—rather than her race—caused her termination. The race discrimination claim cannot survive summary judgment.

## B. Retaliation

The County also argues that it is entitled to summary judgment on Myles' retaliation claim because she cannot demonstrate a causal link between the February 2020 email (that is, the protected activity) and her firing. *See* Def.'s Br. at 9. The County is correct. Title VII bars employers from retaliating against their employees for complaining about discrimination. 42 U.S.C. § 2000e-3(a). For the retaliation

claims to survive summary judgment, Myles must show that a reasonable jury could find that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was motivated by the protected activity. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

Myles appears to base the retaliation claim on her February 2020 email to elected County officials and the fact that Barrientos asked her about the email when he interviewed her about the Lord incident. Pl.'s Resp. at 25–26; OIIG Report at 315 (PDF page number). Myles' response brief does not argue that she has met the prima facie elements of a claim for retaliation and, instead, the brief largely speculates as to Barrientos' true intentions when he asked about the email. Pl.'s Resp. at 25–26. But even if Myles had addressed the prima facie elements of her retaliation claim, she would have fallen short.

The key inquiry for Title VII retaliation claims is whether there is sufficient evidence to allow a reasonable jury to find that the discharge was based on a retaliatory motive. *Igasaki*, 988 F.3d at 959. The purported causal link has no evidentiary support: Myles has not presented evidence that the February 2020 email *caused* the termination. Her only basis for arguing the causal connection is that Barrientos was informed of the email before he investigated the elevator incident; Myles thinks it is suspicious that Barrientos would have been informed of the email. Pl.'s Resp. at 26. But it makes sense, as Barrientos explained, for him to have been informed of the email when he was already investigating: he was also determining whether the email constituted an additional rules violation. *See* Barrientos Dep. at 79:3–15. He

18

ultimately found that the email was *not* itself a violation of the personnel rules. *Id.*
at 82:14–20. So Barrientos' awareness of the email provides no basis for a jury to find
retaliation. Also, the three-month time gap between the February 1, 2020 email and
the firing on May 4, 2020, substantially dispels the connection between two events.
*See* Feb. 2020 Email; Termination Letter. Generally speaking, a three-month gap is
not a reason to suspect a causal link: "For an inference of causation to be drawn solely
on the basis of a suspicious-timing argument, we typically allow no more than a few
days to elapse between the protected activity and the adverse action." *Igasaki*, 988
F.3d at 959 (cleaned up) (holding that a two-month gap was too long in that case to
establish causation). And as previously discussed, the County provided sufficient ev-
idence that it based its disciplinary decision on Myles' violation of the personnel rules
by engaging in the elevator fight with Lord. For these reasons, no reasonable jury
could find that Myles was fired based on retaliation.

### C. Hostile Work Environment

#### 1. Timeliness

Before addressing the merits of Myles' claim for hostile work environment,
there is a preliminary question about whether Myles' complaints of coworker miscon-
duct are time-barred. The County asserts that the coworker misconduct is time-
barred because Myles filed her EEOC complaint on August 19, 2020, which was more
than 300 days after any alleged misconduct by Deima, Lynn, or Bob had occurred.
Def.'s Br. at 11. It is true that Title VII plaintiffs must file their charges with the
EEOC within 300 days after the alleged unlawful employment practice. *See* 42 U.S.C.

19

§ 2000e-5(e)(1). But "[t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). For claims of hostile work environment, some constituent acts comprising the hostile environment may remain actionable even if they fall outside the 300-day limitation so long as at least *one act* comprising the claim happened *within* the filing period. *Id.*

In this case, Myles' EEOC charge states that she was "subjected to a racially divided hostile workplace environment," and that she was ultimately terminated. EEOC Charge. The charge was filed in August 2020, which was within 300 days of her termination in May 2020. The County argues that Myles has admitted that the issues with Deima, Lynn, and Bob were resolved after they were separated sometime in 2019, and thus those issues fall outside the 300-day window. Def.'s Br. at 11; Myles Dep. at 324:2–10; Feb. 2020 Email. But Myles testified that even after Deima and Lynn were moved, they continued to harass her, and she continued to make her complaints known to her supervisors. Myles Dep. at 310:6–311:18, 324:2–10. She also stated that "a lot of things occurred" between 2013 and 2020, and that "if something did occur … [she] definitely made a verbal complaint." *Id.* at 287:8–288:19. So given that the record contains evidence to show that Myles made complaints after the

coworker separation in 2019, a reasonable factfinder could find that the charge was timely filed.

## 2. Prima Facie Case

Moving to the merits of Myles' claim for hostile work environment, the County argues that the conduct she complains of is not objectively severe or pervasive, and in any event, there is no basis for the County's liability for coworker conduct.[5] To survive summary judgment here, a plaintiff must offer enough evidence to show that: (1) she was subject to unwanted harassment; (2) the harassment was based on her race; (3) the conduct was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015); *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). "A hostile work environment is one that is both objectively and subjectively offensive." *Tyburski v. City of Chicago*, 964 F.3d 590, 601 (7th Cir. 2020) (cleaned up). The inquiry into a claim for hostile work environment depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Robinson v.*

---

[5]The County also argues that there is no basis for the County's liability as to Lord's conduct as a third-party. Def.'s Br. at 15; R. 115, Def.'s Reply at 1. Myles did not address or respond to this argument in her brief. She has thus waived the argument, and the Court need not address any claim for hostile work environment based on what Lord did.

*Perales*, 894 F.3d 818, 828 (7th Cir. 2018). Even "conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). For the reasons discussed below, Myles' claim fails on the severity and pervasiveness prong, and the County is entitled to summary judgment on her hostile work environment claim.

As a preliminary matter, neither party disputes that Myles of course did not welcome the harassment, so first element is satisfied. On the second requirement—whether the harassment was based on her race—the County argues that Deima's and Lynn's comments were "not explicitly or implicitly connected to race," Def.'s Br. at 13, and that Bob's comments cannot conclusively be categorized as "racially charged." Def.'s Reply at 4. That argument is way, way off.

It is true that "[m]istreatment at work … is actionable under Title VII only when it occurs because of an employee's … protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (cleaned up). Here, Myles testified that she heard Deima and Lynn refer to another coworker's "usual black girl tude," call her a "black bitch," and say that they were going to "sprinkle some Black magic on Chakeeta." Myles Dep. at 308:10–14; 310:8–24. Deima then approached Myles afterward in an attempt to clarify that she was referring to a *different* Black coworker with the first two comments, and not Myles. Myles Email to Self. No matter who was the target, the comments were explicitly racial—and racist. Myles also testified that Bob used the N-word around five to ten times over seven years. *Id.* at 288:20–289:5. That

22

most offensive word in the English language is unmistakably racial. The record con-
tains ample evidence to lead a reasonable jury to conclude that the harassment was
based on Myles' race.

Next, the County argues that Myles does not offer enough evidence to show
that the County was negligent in preventing the harassment. Def.'s Br. at 14–15. A
negligence standard applies to claims of hostile work environment based on coworker
conduct (rather than a supervisor's conduct): "the plaintiff must show that the em-
ployer has been negligent either in discovering or remedying the harassment." *Vance
v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (cleaned up). An employer "can
avoid liability for coworker harassment if it takes prompt and appropriate corrective
action reasonably likely to prevent the harassment from recurring." *Porter v. Erie
Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (cleaned up).

Here, the County points to the sensitivity training it conducted in 2016 after
receiving Myles' complaints, as well as its efforts to diffuse the tension between
Myles, Deima, and Lynn by physically separating them. Def.'s Br. at 14–15. It is true
that these efforts would preclude a reasonable jury from finding that the County
acted negligently as to Myles' complaints about the pre-training and pre-separation
remarks by Bob and the misconduct by Deima and Lynn. But Myles testified that she
did continue to report more instances of racial hostility to management—both orally
and in writing—even *after* the separation occurred, Myles Dep. at 287:22–288:13, and
that "nothing was ever done" in response. *Id.* at 337:19–338:10. This evidence that

23

Myles' post-separation reports of racial harassment may have gone unaddressed is enough to create a genuine issue of fact on employer negligence.

The final question is whether a reasonable jury could find, giving Myles the benefit of reasonable inferences, that the harassment was severe or pervasive enough to amount to a hostile work environment. The answer is no. To determine whether the harassment was severe or pervasive enough to create a hostile work environment, the key question is whether the harassment "altered the conditions of [her] employment." *EEOC v. Vill. At Hamilton Pointe LLC*, 102 F.4th 387, 401 (7th Cir. 2024). The inquiry requires both a subjective and objective showing of hostility: "the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). Because of this, "[o]ffhand comments, isolated incidents, and simple teasing" are insufficient to establish a hostile work environment claim. *Passananti v. Cook Cnty.*, 689 F.3d 655, 667 (7th Cir. 2012).

Myles has not presented enough evidence to establish that the conduct of Deima, Lynn, or Bob was sufficiently severe or pervasive enough to amount to a hostile work environment. It is true that Myles says (and she must be credited at this stage) that she heard Bob use the N-word five to ten times from 2013 until May 2020, PSOF ¶ 15; Myles Dep. at 288:20–289:5, and that she Deima and Lynn made inappropriate racial jokes within earshot, PSOF ¶¶ 5–6, 8–9. It goes without saying that the N-word is the most loathsome invective there is. But Myles does not claim that

24

Bob was directing his use of the slur *at* her,[6] and she heard him use the word 10 times in seven years. The Seventh Circuit has considered whether racial comments were specifically directed at the plaintiff in determining severity of the harassment. *See Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (declining to sustain a hostile work environment claim based on racial comments made to other coworkers). It is of course possible for a hostile work environment claim to be premised on racial epithets directed at others. But here the relative infrequency (though more than zero is too much) over the seven-year period is insufficient to meet the severe or pervasive standard.

The same goes for the misconduct of Deima and Lynn. In Myles' own words, their harassment amounted to "little things," "passive[] aggressive[] bullying" in the workplace, and happened "maybe a few times a month." Myles Dep. at 310:8–311:9. Given these admissions, a reasonable jury could not find that their actions were severe or pervasive enough. Indeed, Myles does not present concrete evidence on how often ("maybe" is shaky foundation) or for how long this happened.[7] It certainly is possible to envision a scenario in which these "little things" build over time when experienced with regularity over an extended time, but the record here does not

---

[6]Myles' other complaints about Bob—the comments about the Charleston shooting and the voting remarks—also were not directed at Myles personally. *See* Myles Email to Self.

[7]It is worth noting that the County's opening brief argued that the alleged harassment was "isolated" and was not "so frequent" as to unreasonably interfere with her work performance. Def.'s Br. at 12–14. Myles conceivably could have filed a supporting affidavit in response to clarify the frequency or specify a time range for the misconduct (so long as the affidavit did not contradict her deposition testimony). But she did not.

25

establish that the misconduct was severe or pervasive enough to sustain a claim. Summary judgment must be entered against the claim for hostile work environment.

## IV. Conclusion

The County's motion for summary judgment, R. 91, is granted. No reasonable jury could find that the County engaged in race discrimination or retaliation, or that Myles suffered a hostile work environment as defined by Title VII.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: March 27, 2025

26